**UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| **SEYED AMIN SAM MOTAGHEDI,** *et al.*, | **1:19-cv-01466-LJO-SKO** |
| **Plaintiffs,** | |
| v. | **ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION** |
| **MICHAEL R. POMPEO,** *et al.*, | **(ECF No. 10)** |
| **Defendants.** | |

# I. <u>INTRODUCTION</u>

On October 15, 2019, Plaintiffs filed a complaint alleging that Defendants withheld adjudications of case-by-case waivers of Presidential Proclamation 9645, Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry into the United States by Terrorists or Other Public-Safety Threats ("PP 9645"). *See* ECF No. 1 ¶ 1. Plaintiffs raise claims under the Administrative Procedure Act ("APA"), as well as claims for mandamus relief, deprivation of procedural due process, and Equal Protection under the Fifth Amendment. *See generally* ECF No. 1.

On October 25, 2019, Plaintiffs filed a motion for a preliminary injunction. *See* ECF No. 10. Plaintiffs move this Court to declare Defendants' usurpation of consular authority unlawful under Section 3(c) of PP 9645. *See* ECF No. 10 at 2, 14. Plaintiffs additionally request the Court to adjudicate Plaintiffs' waivers within fifteen days. *See id.* "All Beneficiary Plaintiffs in this action have been found eligible for a waiver to PP 9645 by a consular officer between 11 and 23 months ago, and as of

//

//

//

1

[November 20, 2019], they have waited an average of 535 days."[1] *See id.* at 14. Defendants filed an opposition on November 13, 2019. *See* ECF No. 19. Plaintiffs filed a reply on November 20, 2019. *See* ECF No. 24. On December 16, 2019, Defendants filed a motion to dismiss, which is not yet ripe for the Court's review. *See* ECF No. 29. On January 3, 2020, the parties filed a joint informal discovery dispute letter brief. *See* ECF No. 36.

The Court has reviewed the parties' filings and has determined the motion for preliminary injunction is suitable for decision based on the papers under Local Rule 230(g). *See Goldberg v. Barreca*, 720 F. App'x 877, 878 (9th Cir. 2018) (holding district court did not abuse its discretion by failing to hold evidentiary hearing when initially ruling on preliminary injunction motion because it did not need to resolve any factual disputes). For the reasons set forth below, the Court DENIES Plaintiffs' motion for preliminary injunction. The Court reminds the parties that this is a preliminary ruling based on the present law and facts. Additional factual development, changed circumstances, further legal argument at later stages of the case, and the passage of time may affect the Court's analysis.

## II. **BACKGROUND**

Plaintiffs are United States citizens and Lawful Permanent Residents ("Petitioner Plaintiffs") and their Iranian national relatives or fiancées applying for visas ("Beneficiary Plaintiffs").[2] *See* ECF No. 1. ¶ 3. Plaintiffs allege they have fulfilled all requirements to obtain family-based or fiancé-based visas. *See id.* ¶ 5. Their visas have been refused pursuant to PP 9645. *See id.*

PP 9645 prohibits the entry of all immigrants and certain categories of non-immigrants for nationals of Iran, Libya, North Korea, Syria, Venezuela, and Yemen, but provides a mechanism by

---

[1] As of the date Plaintiffs filed their reply brief. *See* ECF No. 24.

[2] Eleven Plaintiffs have been voluntarily dismissed from the lawsuit on December 18, 2019; December 20, 2019; and January 1, 2020. *See* ECF Nos. 28, 30–33. On January 1, 2020, Plaintiffs filed a notice that Plaintiff P.A. died in Tehran, Iran, on December 20, 2019. *See* ECF No. 33. The circumstances of P.A's death are not clear to the Court.

which case-by-case waivers from the ban can be granted. *See id.* ¶ 6; PP 9645 § 2(b). PP 9645 provides that "Iran regularly fails to cooperate with the United States Government in identifying security risks, fails to satisfy at least one key risk criterion, is the source of significant terrorist threats, and fails to receive its nationals subject to final orders of removal from the United States. The Department of State has also designated Iran as a state sponsor of terrorism." PP 9645 § 2(b)(i).

PP 9645 provides that "a consular officer, or the Commissioner, United States Customs and Border Protection (CBP), or the Commissioner's designee, as appropriate, may, in their discretion, grant waivers on a case-by-case basis to permit the entry of foreign nationals for whom entry is otherwise suspended or limited if such foreign nationals demonstrate that waivers would be appropriate . . . ." PP 9645 § 3(c). PP 9645 requires the Secretary of State and the Secretary of Homeland Security to "coordinate to adopt guidance addressing the circumstances in which waivers may be appropriate for foreign nationals seeking entry as immigrants or nonimmigrants." *Id.* This guidance includes standards, policies, and procedures for "determining whether the entry of a foreign national would not pose a threat to the national security or public safety of the United States," "addressing and managing the risks of making such a determination in light of the inadequacies in information sharing, identity management, and other potential dangers posed by the nationals of individual countries subject to" PP 9645, and "assessing whether the United States has access, at the time of the waiver determination, to sufficient information about the foreign national to determine whether entry would satisfy" the national security requirement. *Id.* §§ 3(c)(ii).

PP 9645 further provides that a "waiver may be granted only if a foreign national demonstrates to the consular officer's or CBP official's satisfaction that: (A) denying entry would cause the foreign national undue hardship; (B) entry would not pose a threat to the national security or public safety of the United States; and (C) entry would be in the national interest." PP 9645 § 3(c)(i). If an applicant is determined to be eligible for a visa, then the consular officer automatically considers the applicant for a waiver under PP 9645's three criteria. *See* Pls.' Ex. 63 at 4 (stating each applicant refused a visa under

PP 9645 "must be considered for a waiver"); *see also* Pls.' Ex. 65 at 12 ("An applicant will be refused pursuant to the Proclamation under section 212(f) of the [INA] while their application undergoes administrative processing for a determination on the national security and public safety waiver criterion. However, applicants whose visa applications have been refused for administrative processing will receive a further adjudication—either an issuance or another refusal—upon completion of administrative processing.").

State Department Q&As provide that the first waiver criterion is met when an applicant "demonstrates . . . an unusual situation exists that compels 'immediate' travel by the applicant . . . ." Pls.' Ex. 57 at 7; Ex. 60 at 5. The second criterion is met when an applicant "demonstrates . . . that a U.S. person or entity would suffer hardship if the applicant could not travel until after visa restrictions imposed with respect to nationals of that country are lifted," and the travel would be futile if it did not happen until after the restrictions were lifted. *See* Pls.' Ex. 57 at 7–8.

Plaintiffs are individuals for whom consular officers have proposed a waiver, or whose eligibility for a waiver is being reviewed. *See, e.g.*, ECF No. 10-1 at 22; ECF No. 19 at 4–5; Pls.' Exs. 32–44. Plaintiffs contend that a "group within the Department of State, known as the 'PP 9645 Brain Trust' has implemented a policy and procedure stripping consular officers of the discretion granted to them by PP 9645." ECF No. 10-1 at 22–23. Under this policy, Plaintiffs allege "consular officers have been forced to seek the concurrence of the Visa Office before granting any PP 9645 waiver. Only with the concurrence of the 'consular manager' in [Washington, D.C.], may a waiver be granted and a visa be issued." ECF No. 10-1 at 23 (citing Pls.' Ex. 56 at 6 & Pls.' Ex. 57 at 7). Plaintiffs state that PP 9645 does not provide for consular manager's concurrence in waiver adjudications. *See* ECF No. 10-1 at 22–23; *see generally* PP 9645 § 3(c). Plaintiffs argue that Defendants acting through "a series of State Department cables, Operational Q&A Guidance, adjudicator flowcharts . . . and individualized directives," the Brain Trust has "stripped the discretion of consular officers to approve waivers by mandating the Visa Office and other opaque agencies and offices concur in a decision to approve

4

waivers before a consular officer may issue a waiver . . . . Consular officers have no discretion whatsoever to approve waivers to PP 9645 and only make recommendations as to waiver adjudications." *See* ECF No. 10-1 at 24 (citing Exs. 74–81).

Plaintiffs allege that this requirement is contrary to PP 9645. *See* ECF No. 1 ¶¶ 10–14. Specifically, Plaintiffs allege Defendants "have unlawfully crafted a waiver adjudication scheme that, in its application, leads to the ongoing withholding of and/or untimely and unfair processing of case-by-case waivers for Beneficiary Plaintiffs, as well as the case-by-case waivers of all visa applicants similarly situated." *See id.* ¶ 13; ECF No. 10-1 at 24–26 (citing Pls.' Exs. 12–13, 71). Plaintiffs also quote one December 14, 2017, e-mail from Joel Nantais, a State Department Passport and Visa Examiner, which states: "Please be clear that the goal of this effort is not to create timely processing of waivers for any applicant who is ineligible under the proclamation."[3] ECF No. 1 at 37–38; ECF No. 10 at 26. Plaintiffs argue that this demonstrates "Defendants' pattern and policy of unreasonable delay in dealing with waiver adjudication, as well as actions that are arbitrary and capricious." ECF No. 1 ¶¶ 10–14.

According to a State Department report on the implementation of PP 9645, "[a]t the beginning of July 2019, approximately 17,000 cases were undergoing national security and public safety reviews as part of the waiver consideration process." *See* Pls.' Ex. 75 at 3. For the time period December 8, 2017, to October 31, 2018, 5,978 visa applications from individuals from Iran were undergoing administrative processing for a determination on national security and public safety waiver criterion.[4] *See* Pls.' Ex. 65

---

[3] Plaintiffs do not specify which exhibit this quote references. A review of the Northern District of California's decision in *Najafi v. Pompeo* suggests the following sentence in this e-mail would have provided: "The goal is to as thoroughly and effectively screen and vet every affected applicant prior to waking [sic] a waiver determination." *Najafi v. Pompeo*, No. 4:19-cv-05782-KAW, 2019 WL 6612222, at *2.

[4] However, a document from the Department of State/AILA Liaison Committee Meeting from October 3, 2019, also provides: "The [State] Department is unable to extract the exact number of applicants that are under administrative

at 12.

On September 24, 2019, Edward Ramotowski, Deputy Assistant Secretary for the State Department's Bureau of Consular Affairs, testified that "[w]e anticipate that a majority of pre-July 2019 waiver cases pending with the Department, most of which require some degree of manual review, should be completed by the end of 2019 or soon thereafter." *See* Pls.' Ex. 73 at 4.[5] On October 3, 2019, the State Department posted on its website answers to questions posed by the American Immigration Lawyers Association ("AILA"). *See* Pls.' Ex. 69. The State Department explained:

> [T]he new automated system for security vetting occurs prior to interview and provides consular officers with the information required to make post PP 9645 waiver determinations much more quickly. The new system is expected to significantly increase the speed and efficiency of the vetting process for both currently pending and future [PP 9645]-subject applications while enhancing security standards. While it is too early to ascertain the full impact on new [PP 9645]-subject applications, initial evidence indicates that consular officers are now able to make most waiver decisions within a few days of the visa interview. In the short time this system has been in place, the month-to-month change in visas issued pursuant to a waiver rose from a steady 10 to 12 percent from before the new system, to more than 50 percent each month. . . . We anticipate that a majority of pre-July 2019 waiver cases pending with the Department, most of which require some degree of manual review, should be completed within the next six months.

Pls.' Ex. 69 at 9.

While the Court granted Plaintiffs' application for expedited discovery which requested Defendants to answer whether the new enhanced automated screening is being applied to the Beneficiary Plaintiffs (ECF No. 20), Defendants have only confirmed as to certain Plaintiffs that a "consular officer *will use* the enhanced automated interagency national security and law enforcement review . . . ." Defs.' Resps. to Pls.' Interrog. Nos. 3, 5, 8, 11, 14, 16 (ECF No. 36-1) (emphasis added). As to others, Defendants state the enhanced automated screening is not being used because the consular

processing to determine waiver eligibility." Pls.' Ex. 69 at 9 (also publicly available via

https://travel.state.gov/content/travel/en/News/visas-news/20191003_dept-of-state-meeting-with-aila.html.).

[5] Testifying before the House Judiciary Committee Subcommittee on Immigration and Citizenship and Foreign Affairs Committee Subcommittee on oversight and Investigations. *See* Pls.' Ex. 73 at 4.

officer is waiting for information from the applicants. *See* Defs.' Resps. to Pls.' Interrog. Nos. 6–7, 9, 12–13, 15, 17, 18, 20–21 (ECF No. 36-1). Defendants also do not answer whether the enhanced automated screening is being used for other plaintiffs. *See* Defs.' Resps. to Pls.' Interrog. Nos. 4, 19 (ECF No. 36-1). As Defendants correctly indicate, "Plaintiffs did not rely on any of those discovery responses to modify or amend the pending Motion for Preliminary Injunction, which was the purported basis for seeking expedited discovery." ECF No. 36 at 10.

Plaintiffs allege irreparable harm to their mental health, including trauma, depression, and anxiety, because of the prolonged family separation. *See* ECF No. 10-1 at 17–18. Several Plaintiffs have been hospitalized for emotional breakdowns and worsening of diseases and cognitive disabilities. *See id.* at 18 (citing declarations in Pls.' Exs. 1–11, and medical assessments in Pls.' Exs. 15–21).[6] Plaintiffs also notified the Court on January 1, 2020, that Plaintiff P.A. died in Tehran, Iran, on December 20, 2019. *See* ECF No. 33. At this time, it is unclear to the Court how Plaintiff P.A. passed away.

Plaintiffs highlight their fear of the escalating threat of war and active conflict between the United States and Iran.[7] In their reply, Plaintiffs included evidence of Iran's crackdown on protestors. *See* Pls.' Reply Br. Ex. B (*New York Times* article noting "Iran imposed an almost complete nationwide internet blackout on [November 17, 2019], making one of its most draconian attempts to cut off Iranians

---

[6] While some Plaintiffs have been dismissed, the facts of their applications are part of the record before the Court, and they may shed additional light on the unreasonable delay and irreparable harm analyses. *See Nine Iraqi Allies Under Serious Threat Because of their Faithful Service to the United States v. Kerry*, 168 F. Supp. 3d 268, 286 (D.D.C. 2016).

[7] *See* ECF No. 10-1 at 18; *see also* Pls.' Ex. 82 at 1 (September 15, 2019, *Twitter* post from President Trump stating "Saudi Arabia oil supply was attacked. There is reason to believe that we know the culprit, are locked and loaded . . . ."); Pls.' Ex. 82 at 3 (July 3, 2019, *Twitter* post from President Trump stating "Be careful with the threats, Iran. They can come back to bite you like nobody has been bitten before!"); Pls.' Ex. 82 at 5 (July 22, 2018, *Twitter* post from President Trump stating "To Iranian President Rouhani: NEVER, EVER THREATEN THE UNITED STATES AGAIN OR YOU WILL SUFFER CONSEQUENCES THE LIKES OF WHICH FEW THROUGHOUT HISTORY HAVE EVER SUFFERED BEFORE.").

from each other and the rest of the world as widespread anti-government unrest roiled the streets of Tehran and other cities for a third day . . . . The death toll for the three days of protests rose to at least 12; hundreds were injured; and more than 1,000 people have been arrested" and "The Associated Press reported that Iran also experienced wide disruptions and outages of internet service . . ."). Plaintiffs filed declarations stating that they have not been able to contact their relatives or fiancées in Iran, leading to worsening fear and anxiety. *See* Pls.' Reply Br. Ex. C ("We cannot contact my brother. . . My mom . . . has heart problem, high blood pressure, and chronic migraine and any pressure and stress is threatening for her health."); Pls.' Reply Br. Ex. D ("[W]e . . . have to talk to my dad and see his face over the Whatsapp, send messages through Telegram, speak with him by Skype, or call him on the phone. Now we do not have any of this [sic] options due to internet issues. . . . [My dad] is sick."); Pls.' Reply Br. Ex. E ("I can't communicate with my wife using the app Whatsapp which we have always used for the past 6 years."); Pls.' Reply Br. Ex. F ("This protest has made me super anxious . . . I see even my text messages are not delivered, or my phone calls can't be answered which makes everything harder since that's the only way I communicate with my husband . . . .I'm worried about my husband."); Pls.' Reply Br. Ex. G ("As of 11 A.M[.] Saturday, November 16th, 2019 I was not able to contact [my fiancée] via Whatsapp. Also, I had tried to contact [my fiancées'] father, and none of my calls or messages was [sic] delivered. I am very worried about [my wife] and her family. . . . The only option we had to talk, and meet each other in the past 16 months was through the video calls that due to internet blockage in Iran we do not even have such opportunities at the moment. Also, I am very worried about her safety, and security in Iran.").

### III. <u>STANDARD OF DECISION</u>

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Natural Resources Defense Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted). "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and

that an injunction is in the public interest." *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 877 (9th Cir. 2009) (quoting *Winter*, 555 U.S. at 20). An injunction may only be awarded upon a clear showing that the plaintiff is entitled to relief. *See Winter*, 555 U.S. at 22 (citation omitted).

Courts within the Ninth Circuit may evaluate the *Winter* factors on a sliding scale. "[S]erious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134–35 (9th Cir. 2011). A plaintiff can meet this sliding scale burden if he "demonstrates *either* a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor." *Johnson v. Cal. State Bd. of Accountancy*, 72 F.3d 1427, 1429 (9th Cir. 1995) (emphasis in original) (internal quotations and citation omitted). "To reach this sliding scale analysis, however, a moving party must, at an 'irreducible minimum,' demonstrate some chance of success on the merits." *Global Horizons, Inc. v. U.S. Dep't of Labor*, 510 F.3d 1054, 1058 (9th Cir. 2007) (citing *Arcamuzi v. Cont'l Air Lines, Inc.*, 819 F.2d 935, 937 (9th Cir. 1987)).

A mandatory injunction "orders a responsible party to take action." *Meghrig v. KFC W., Inc.*, 516 U.S. 479, 484 (1996). In general, mandatory injunctions are not granted unless extreme or very serious damage will result. *See Marlyn Nutraceuticals*, 571 F.3d at 879. A mandatory injunction that "goes well beyond simply maintaining the status quo [p]endente lite is particularly disfavored." *Id.*

## IV. DISCUSSION

### A. Likelihood of Success on the Merits

#### 1. Judicial Review

The APA requires agencies to conclude matters presented to it within a reasonable time. *See* 5 U.S.C. § 555(b) ("With due regard for the convenience and necessity of the parties or their representatives and within a reasonable time, each agency shall proceed to conclude a matter presented

to it"). Under the APA, courts may "compel agency action unlawfully withheld or unreasonably delayed." *Id.* § 706(1). The APA does not apply, however, if a statute precludes judicial review or "agency action is committed to agency discretion by law." *Id.* §§ 701(a)(1)–(2). Section 706(1) "empowers a court only to compel an agency action 'to perform a ministerial or non-discretionary act,' or 'to take action upon a matter, without directing *how* it shall act.'" *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 64 (2004) (emphasis in original) (internal citations omitted).

Plaintiffs argue that PP 9645 requires Defendants to adjudicate waiver considerations, but Defendants have failed to do so within a reasonable time. Plaintiffs also argue that Defendants do not have discretion to refuse to process, withhold decisions, or unreasonably delay Plaintiffs' waiver consideration pursuant to PP 9645. Plaintiffs assert that Defendants have failed to act within a reasonable time because they failed to adjudicate Beneficiary Plaintiffs' visa waivers within 180 days.[8]

### a. **Presidential Action**

First, Defendants argue PP 9645 is a presidential action that may not be challenged under the APA. *See* ECF No. 19 at 6–7. The Court refers Defendants to its November 12, 2019, order. *See* ECF No. 20 at 5:

> The Ninth Circuit, however, has found that "under certain circumstances, Executive Orders, with specific statutory foundation, are treated as agency action and reviewed under the [APA].'" *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1166 (9th Cir. 1997). Therefore, "an executive order or presidential proclamation may also be subject to judicial review under the APA and treated as agency action when the order or proclamation 'rests upon statute.'" *W. Watersheds Project v. Bureau of Land Mgmt.*, 629 F. Supp. 2d 951, 965 (D. Ariz. 2009) (quoting *Legal Aid Soc'y v. Brennan*, 608 F.2d 1319, 1330 n.15 (9th Cir. 1979)).

> Here, PP 9645 was issued pursuant to INA § 212(f), 8 U.S.C. § 1182. *See Trump v. Hawaii*, 138 S. Ct. 2392, 2408 (2018) (finding PP 9645 was lawful exercise of discretion granted by § 1182). Further, as the case here concerns the implementation of PP 9645, Defendants' actions are reviewable under the APA. *See Hawaii v. Trump*, 878 F.3d 662, 680–81 (9th Cir. 2017) ("because these agencies have consummated their implementation of the Proclamation, from which legal consequences will flow, their actions are 'final'

---

[8] Plaintiffs do not provide any justification for this deadline.

and therefore reviewable under the APA"), *rev'd and remanded on other grounds by Trump v. Hawaii*, 138 S. Ct. 2392 (quoting *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997)).

ECF No. 20 at 5.

### b. Private Enforceable Rights

Second, Defendants assert that PP 9645 does not create any privately enforceable rights because PP 9645 expressly indicates that it "is not intended to, and does not, create any right or benefit . . . ." ECF No. 19 at 6–7 (citing Procl. § 9(c), 82 Fed. Reg. at 45168)). Moreover, Defendants argue that "private parties may not privately enforce compliance with a Presidential Proclamation or executive order." *See* ECF No. 19 at 6–7.

As this Court has previously held, an "executive order is privately enforceable only if it is issued pursuant to a statutory mandate or delegation of congressional authority." *See Chai v. Carroll*, 48 F.3d 1331, 1338 (4th Cir. 1995). Accordingly, since PP 9645 is subject to judicial review because PP 9645 was issued pursuant to INA § 212(f), 8 U.S.C. § 1182, the Court again rejects Defendants' argument that PP 9645 is not privately enforceable. *See* ECF No. 20 at 6–7.

### c. Agency Discretion

Third, Defendants argue that the APA does not permit review of waiver determinations because the APA does not apply to agency action committed to agency discretion by law. *See* ECF No. 19 at 7. Instead, Defendants aver that they have discretion to not adjudicate waivers *at all*. *See id.* ("The Proclamation provides no right for an individual to receive a decision on waiver application within any set period of time, nor does it expressly impose a duty that the waiver application be adjudicated at all, in contrast to a decision on a visa, for example.")

Plaintiffs do not appear to challenge the grant or denial of waivers. Rather, they appear to challenge Defendants' alleged policies that delay waiver adjudications. *See generally* ECF Nos. 1, 10, 11; *see also Nine Iraqi Allies*, 168 F. Supp. 3d at 290–91 ("[w]hen the Government simply declines to provide a decision in the manner provided by Congress, it is not exercising its prerogative to grant or

deny applications but failing to act at all."). In other words, Plaintiffs appear to challenge the pre-waiver *implementation* of PP 9645, which falls outside the doctrine of consular nonreviewability. *See* ECF No. 20 at 5–6; *see also Nine Iraqi Allies*, 168 F. Supp. at 290 ("the doctrine of consular nonreviewability is not triggered until a consular officer has made a <u>decision</u> with respect to a particular visa application") (emphasis in original).

Plaintiffs' APA claims are additionally premised upon the theory that Defendants are not following their own guidance regarding waiver considerations and are instead usurping consular officers' authority to grant waivers. *See Darchini v. Pompeo*, No. 8:19-cv-01417-JVS-DFM, 2019 WL 7195621, at *4 (C.D. Cal. Dec. 3, 2019); *Emami v. Nielsen*, 365 F. Supp. 3d 1009, 1019 (N.D. Cal. 2019) ("The gravamen of the complaint is that the government has flouted its own guidelines and statements about case-by-case determinations of waiver applications in favor of a policy of blanket denials . . . . Those issues do not require review of an individual consular officer's decision."). Thus, Defendants' argument does not apply.

Perhaps more troubling is Defendants' argument that PP 9645 does not "expressly impose a duty that the waiver application be adjudicated *at all*, in contrast to a decision on a visa, for example." *See* ECF No. 19 at 7 (emphasis added). As several courts have recognized, in upholding the constitutionality of PP 9645, the Supreme Court relied in part on the waiver program, through which "consular officers *are* to consider in each admissibility determination whether the alien demonstrates that (1) denying entry would cause undue hardship; (2) entry would not pose a threat to public safety; and (3) entry would be in the interest of the United States." *See Najafi*, No. 4:19-cv-05782-KAW, 2019 WL 6612222, at *5 (emphasis added) (quoting *Trump v. Hawaii*, 138 S. Ct. at 2422); *Emami v. Nielsen*, 365 F. Supp. 3d 1009, 1013 (N.D. Cal. 2019) ("The allowance for waivers in the Proclamation was an important reason why the five-justice majority upheld it as serving a legitimate national security interest."). Indeed, the State Department's February 2018 response to Senator Chris Van Hollen provides that every applicant who is subject to PP 9645 who is otherwise eligible for a visa "*must* be considered for a waiver." Pls.'

Ex. 63 at 2 (emphasis added). In its February 2019 response to Senator Van Hollen, the State Department provided: "If an applicant does not fall into an exception category, but is otherwise eligible for a visa, a consular officer will automatically consider the applicant for a waiver based upon the three-part test set forth in PP 9645. The applicant need not prepare any separate application for a waiver." Pls.' Ex. 65 (emphasis in original); Pls.' Ex. 81 at 6, 9 FAM ("Foreign Affairs Manual") 302.14-10(D) ("You must determine whether the applicant may qualify for a waiver."). If Defendants' current position is that they are not required to adjudicate the waiver applications *at all*, this would "render the waiver program illusory, negating one of the bases for finding that PP 9645 was legal in the first place." *Najafi*, 4:19-cv-05782-KAW, 2019 WL 6612222, at *5. The Court therefore rejects Defendants' argument that no decision needs to be reached at all.

Defendants aver "[e]ven if the delegation of discretion were not expressly committed to another branch, there is no standard for a reviewing court to impose a timing requirement on this exercise of discretion." ECF No. 19 at 7. As discussed above, however, Defendants do not have the discretion to refuse to process or withhold decisions. The absence of any standard upon which to frame a timing requirement is not unusual in APA unreasonable delay cases. As discussed below, the Ninth Circuit's framework for evaluating such claims takes this into account.

### d. <u>Consular Nonreviewability</u>

Defendants argue that the consular nonreviewability doctrine extends to "not only the decision to issue or refuse a visa, but also the timing of that decision." ECF No. 19 at 8–9. Defendants contest Plaintiffs' framing of the issue as a delay in adjudicating waivers as opposed to the denial of their visas. *See id.* at 9.

To the extent Defendants argue that the visas have been refused and therefore consular nonreviewability applies, this argument is unpersuasive given that Plaintiffs received automatic responses from Defendants stating the waivers are in "administrative processing." *See*, *e.g.,* Pls.' Exs. 35, 37–44, 46–51, 52–53, 83–97; *see also Nine Iraqi Allies*, 168 F. Supp. at 276, 283–84 (rejecting

Government's argument that applications have been finally refused despite acknowledging plaintiffs' applications may still be granted following "administrative processing"). At least three Plaintiffs have been issued visas after being "denied" under PP 9645. *See* Defs.' Resps.' to Pls.' Interrog. Nos. 1–2, 10 (ECF No. 36-1).

As discussed above, waiver considerations also appear to be mandatory. *See, e.g.*, Pls.' Ex. 57 ("each applicant who meets the conditions described in the question posed above must be consider for a waiver"); Pls.' Ex. 58 ("Before you refuse an applicant under the P.P., you must determine whether the applicant may qualify for a waiver. The waiver decision may not be resolved on the same day as the in-person interview, because the consular officer must determine whether the three waiver criteria are satisfied."); Pls.' Ex. 65 at 12 ("An applicant will be refused pursuant to the Proclamation under section 212(f) of the [INA] while their application undergoes administrative processing for a determination on the national security and public safety waiver criterion. However, applicants whose visa applications have been refused for administrative processing will receive a further adjudication—either an issuance or another refusal—upon completion of administrative processing"); Pls.' Ex. 81 at 6, 9 FAM ("Foreign Affairs Manual") 302.14-10(D) ("You must determine whether the applicant may qualify for a waiver. In recognition of significant enhancements to automated interagency vetting systems, an SAO[9] is no longer required before a waiver decision may be reached. However, applicants subject to PP 9645 should still be refused using refusal code 'EO17' on the day of interview."). Thus, Defendants' own guidance and e-mail responses demonstrate that any visa "refusals" are not final. *See also Nine Iraqi Allies*, 168 F. Supp. 3d at 285 (noting Government's "artfully worded letter appears calculated to obtain the benefits of consular reviewability and to comply with internal State Department regulations by indicating that a decision has been made" where notice stated visa had been refused under INA until administrative processing is completed and that embassy will contact plaintiff when finished or that

---

[9] "SAO" appears to stand for "Security Advisory Opinion." *See* Pls.' Ex. 68 at 12.

application needs further administrative processing, and "[w]e cannot give you a definitive date when the processing will be completed, and it will likely take several months or more") (internal citation omitted)). "The Government cannot have it both ways." *See id.* at 289. The doctrine of consular nonreviewability has no application to Plaintiffs' claims in this case.

## 2. **Unreasonable Delay**

Courts analyze the factors from *Telecommunications Research & Action Center("TRAC") v. FCC* to determine when defendants' conduct constitutes an unreasonable delay under § 706(1). *See* 750 F.2d 70 (D.C. Cir. 1984).[10] The *TRAC* factors include:

> (1) the time agencies take to make decisions must be governed by a "rule of reason";
> (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;
> (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;
> (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;
> (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and
> (6) the court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed.

*TRAC*, 750 F.2d at 79–80 (internal citations and quotation marks omitted).

Courts within the Central District of California and Northern District of California analyzing PP 9645 cases have recently held that Plaintiffs could not likely prevail on their unreasonable delay claims

---

[10] Defendants argue that the *TRAC* factors do not apply. *See* ECF No. 19 at 10. Defendants argue that under *Heckler v. Chaney*, there is no "meaningful standard against which to judge the agency's exercise of discretion." ECF No. 19 at 10 (quoting *Heckler v. Chaney*, 470 U.S. 821, 830 (1985)). This Court has previously noted that *Heckler* applies to judicial review of discretionary agency decisions. *See Houle v. Riding* No. 1:07-1266-LJO-GSA, 2008 WL 223670, *6 (E.D. Cal. Jan. 28, 2008). As in *Houle*, Plaintiffs seek review of Defendants' alleged inaction, not review of a discretionary decision. *See id.* Accordingly, the *Heckler* standard is inapplicable.

where plaintiffs waited between 430[11] to 501 days on average for waiver adjudications. *See Darchini*, No. 8:19-cv-01417-JVS-DFM, 2019 WL 6841991, *2, *5 (C.D. Cal. Sept. 24, 2019); *Najafi*, No. 4:19-cv-05782-KAW, 2019 WL 6612222, *3; *Yavari v. Pompeo*, No. 2:19-cv-02524-SVW-JC, 2019 WL 6720995, *8 (C.D. Cal. Oct. 10, 2019). One district court from the District of Columbia analyzing PP 9645 also held that an eight-month delay in adjudicating waivers is not *per se* unreasonable. *See Moody v. Pompeo*, No. 1:19-cv-01151-TSC, *5 (D.D.C. May 13, 2019) ("because Plaintiffs have not demonstrated that the [eight-month] delay is *per se* unreasonable, or unreasonable given the circumstances attendant to this case, Plaintiffs have not established a likelihood of success on the merits; they have established only that their claims are plausible.").

### a. <u>Rule of Reason</u>

"The reasonableness determination is a fact-specific inquiry," and the "length of delay alone is not dispositive." *Mugomoke v. Curda*, No. 2:10-cv-02166-KJM-DAD, 2012 WL 113800, at *8 (E.D. Cal. Jan. 13, 2012). Therefore, courts "look[] to the source of the delay—e.g., the complexity of the investigation as well as the extent to which the defendant[s] participated in delaying the proceeding." *Qureshi v. Napolitano*, No. C-11-05814-YGR, 2012 WL 2503828, at *4 (N.D. Cal. June 28, 2012) (internal citations omitted).

### (1) <u>Length of Delay</u>

Defendants argue that courts generally find delays less than four years to not be unreasonable. *See* ECF No. 19 at 11 (citing *Khan v. Johnson*, 65 F. Supp. 3d 918, 929 (C.D. Cal. 2014) (quoting *Islam v. Heinauer*, 32 F. Supp. 3d 1063, 1071–72 (N.D. Cal. 2014) ("*Islam II*") (collecting cases))). The Court has reviewed *Khan v. Johnson*, *Islam II*, as well as the cases *Islam II* collected. Nothing in these cases suggests Plaintiffs were outside of the United States while awaiting visa adjudications. *See Khan v.*

---

[11] The State Department received a *Yavari* plaintiff's waiver application on August 6, 2018, and the *Yavari* court's order was dated October 10, 2019. *See Yavari*, No. 2:19-cv-02524-SVW-JC, 2019 WL 6720995, at *8.

*Johnson*, 65 F. Supp. 3d 918, 929–30 (C.D. Cal. 2014) (denying Government's motion to dismiss, reasoning, in part, seven-year delay to adjudicate I-485 petition without giving any indication that hold was not indefinite for plaintiff living in United States); *Islam II*, 32 F. Supp. at 1071–72 (holding nearly six-year delay to adjudicate plaintiff's I-485 petition unreasonable without indicating if or when plaintiff's petition would be adjudicated for plaintiff in United States); *Islam v. Heinauer*, No. C-10-04222-JSW, 2011 WL 206661, *6 (N.D. Cal. May 25, 2011) ("*Islam I*") (holding three-year delay in adjudicating I-485 application for plaintiff in United States is not yet unreasonable, but noting it could "foresee a point at which the delay in ruling on [plaintiff's] I-485 Application would be unreasonable."); *Dosouqi v. Heinauer*, No. C-12-3946-PJH, 2013 WL 664150, *2 (N.D. Cal. Feb. 22, 2013) (holding three-and-a-half-year delay in adjudicating I-485 application not unreasonable, specifically reasoning *Dosouqi* plaintiff was not "separated from his wife and family as a result of [the Government's delay]" as in *Qureshi*); *Khan v. Scharfen*, No. 08-1398 SC, 2009 WL 941574, at *4, *8–9 (one-year delay after reopening case was not unreasonable for plaintiff not subject to removal as asylee); *Sagier v. USCIS*, No. 3:11-cv-05537-JSC, *13 (N.D. Cal. May 3, 2012) (concluding four-year delay in adjudicating I-485 petition was not yet unreasonable where defendants were "actively investigating and applying exemptions . . . especially given that [plaintiff] is not under a threat of deportation and is able to work and travel . . . ."); *Mugomoke*, No. 2:10-cv-02166-KJM-DAD, 2012 WL 113800, at *8–9 (holding Government failed to show seven-year delay was not unreasonable where Government failed to give any indication they might adjudicate I-485 petition for asylee living in United States); *Ahrary v. Curda*, No. 2:11-cv-02992-GEB-EFB, 2012 WL 1641411, *1, *4 (E.D. Cal. May 9, 2012) (holding Government failed to show eleven-year delay was not unreasonable despite citing examples of other exemptions granted since 2006, it provided no indication as to when plaintiff might be granted exemption, if at all); *Tewolde v. Wiles*, No. C-11-1077-JLR, 2012 WL 750542, *1, *9 (W.D. Wash. Mar. 7, 2012) (denying defendants' summary judgment motion involving nearly nine-year delay in adjudicating I-485 petition for asylee); *see also Hassane v. Holder*, No. C10-314Z, 2010 WL 2425993, *4–5 (W.D. Wash. June 11,

2010) (finding 22-month delay to adjudicate I-485 petition for asylee not unreasonable).

The Court could not find any case law showing that family separation could be considered in the "rule of reason" factor for unreasonable delay—rather, it appears to be a factor in the "human health and welfare" and "prejudice" prongs of the *TRAC* analysis. *See Qureshi*, No. C-11-05814-YGR, 2012 WL 2503828, *3 ("Defendants do not dispute that Plaintiff suffers emotionally and financially from being separated from his family and that the benefits of permanent residence and eventual citizenship are also delayed . . . significant health and welfare implications exist here for Plaintiff and his family"); *Doe v. Risch*, 398 F. Supp. 3d 647, 657–58 (N.D. Cal. 2019) (holding "health and human welfare" and "interests prejudiced" *TRAC* factors tip in plaintiffs' favor where family separation caused plaintiffs to suffer extreme anxiety and depression). *But see Dosouqi*, No. C-12-3946-PJH, 2013 WL 664150, at *2 (reasoning, without specifying *TRAC* factor, "[t]he key difference between those cases [where five-year delay was found unreasonable and reasonable] was that, in *Quereshi*,[12] the plaintiff was separated from his wife and family as a result of USCIS' delay, whereas there was no such harm in *Beyene*.").

In any event, this Court is not entirely convinced that the four-year guidepost suggested by these cases involving I-485 petitions where plaintiffs were likely in the United States is a direct comparison to what is happening in this case, in which Plaintiffs have been waiting an average of 535 days for waiver adjudications, whose families are enduring harsh separation, and whose relatives are living under the escalating threat of war and the inability to contact their relatives due to the largest Internet shutdown observed in Iran. *See* Pls.' Reply Br. Ex. B at 1–2; *see generally* Pls.' Reply Br. Exs. C–F. Absent contradictory authority, however, the Court recognizes that the 535-day delay for Plaintiffs' waiver adjudications likely does not tip in the Plaintiffs' favor at this time.

"[L]ength of delay alone is not dispositive." *Mugomoke v. Curda*, No. 2:10-cv-02166-KJM-DAD, 2012 WL 113800, at *8; *Najafi v. Pompeo*, No. 4:19-cv-05782-KAW, 2019 WL 6612222, at *6.

---

[12] For purposes of this quotation, the Court retains the original spelling from *Dosouqi*.

Therefore, the Court will next examine the source of the delay. *See Qureshi*, No. C-11-05814-YGR, 2012 WL 2503828, at *4.

### (2)     Source of Delay

Courts "look[] to the source of the delay—e.g., the complexity of the investigation as well as the extent to which the defendant[s] participated in delaying the proceeding." *Qureshi*, No. C-11-05814-YGR, 2012 WL 2503828, at *4 (internal citations omitted).

Plaintiffs argue they have "already endur[ed] extended wait times and extra security checks during their family-based immigration process due to their nation of origin." ECF No. 10-1 at 17 (citing Pls.' Exs. 54–55; Ex. 56 at 15; Ex. 57 at 19; Ex. 58 at 24; Ex. 72 at 3); *see also* ECF No. 10-1 at 20 (arguing Plaintiffs have already undergone "thorough security and system checks during the visa petition process . . . at multiple government agencies, including the Department of Justice, Federal Bureau of Investigation, and multiple bureaus within the Defendant Department of Homeland Security") (citing USCIS Policy Manual, General Adjudication Procedures Chapter 10.3)). Plaintiffs argue they "now face indefinite family separation due to Defendants' withholding and unreasonable delay of mandatory waiver considerations of and pursuant to PP 9645 despite Defendants['] admission that waiver considerations can be completed in 'one business day.'" ECF No. 10-1 at 17 (citing Pls.' Exs. 54–55; Ex. 56 at 15; Ex. 57 at 19; Ex. 58 at 24; Ex. 72 at 3). Plaintiffs add that because "Defendants implemented automated screening [in early July 2019] . . . two weeks is more than reasonable . . . to complete Beneficiary Plaintiffs' waiver adjudications." ECF No. 10-1 at 15 n.1.

The Court has reviewed the exhibits Plaintiffs cites and does not find they conclusively support the proposition that Defendants can complete waiver considerations in "one business day" in this case. *See* Pls.' Ex. 54 at 1 ("In urgent cases, a response from the Visa Office can be provided within one business day, provided that the Visa Office has all the information needed. If additional information is needed from post or if a case requires further discussion with other offices and agencies, the response may take longer and could take a week or more"); Pls.' Ex. 55 at 1 (same); Pls.' Ex. 56 at 15 (same);

Pls.' Ex. 57 at 19 (same); Pls.' Ex. 58 at 24 (same); *see also Najafi*, No. 4:19-cv-05782, 2019 WL 6612222, at *7 ("The e-mail does not suggest that waiver considerations can in fact be completed in one business day; it only states that responses can be provided in one business day in urgent cases. It is not clear, however, that this e-mail address is used for waiver considerations only . . . .").

*Najafi* and *Darchini* are recent cases involving PP 9645. In *Najafi*, the Northern District noted the Supreme Court's acceptance of PP 9645's "extensive findings describing how deficiencies in the practices of select foreign governments . . . deprive the Government of 'sufficient information to assess the risks those countries' nationals pose to the United States.'" *Najafi*, No. 4:19-cv-05782, 2019 WL 6612222, at *6 (quoting *Trump v. Hawaii*, 138 S. Ct. at 2408). In *Darchini*, the Central District was "persuaded by the Government's argument that this vetting process 'is more difficult and time consuming for Iranian nationals because, the Presidential Proclamation explains, Iran does not adequately provide public-safety and terrorism-related information . . . . 'any delay alleged is not unreasonable under the circumstances and certainly nowhere close to what would amount to an excessive delay under even domestic immigration processing standards.'" *Darchini*, No. 8:19-cv-01417, 2019 WL 6841991, at *8 (internal citations omitted).[13]

---

[13] Within the I-485 petition context (a process used by persons who are applying for lawful permanent resident status from within the United States), other courts analyzing whether the Government has unreasonably delayed plaintiffs' adjudications have rejected the Government's mere invocation of national security without facts specifying why plaintiffs would pose a risk to national security, or without identifying if or when plaintiffs' petitions would be adjudicated. *See, e.g., Qureshi*, No. C-11-05814-YGR, 2012 WL 2503828, at *6 ("[M]ere invocation of national security is not enough to render agency delay reasonable per se.") (quoting *Singh v. Still*, 470 F. Supp. 2d 1064, 1069 (N.D. Cal. 2007)); *Doe v. Risch*, 398 F. Supp. 3d 647, 656 (N.D. Cal. 2019) (same); *Johnson*, 65 F. Supp. 3d at 929 ("[a]lthough the government's time-consuming exemption process 'requires careful deliberation' and the 'coordination of numerous agencies,' there comes a point where the seemingly indefinite delay of an I-485 petition becomes untethered from any discernable 'rule of reason.'"); *Islam II*, 32 F. Supp. 3d at 1072 (same); *Mugomoke*, No. 2:10-cv-02166-KJM-DAD, 2012 WL 113800, at *7 (rejecting defendants' argument that exemption procedure requires significant interagency consultation where defendants failed to explain when plaintiff could

Given the facts at this preliminary stage, "the extent to which the defendant[s] participated in delaying the proceeding" is unknown. *See Qureshi*, No. C-11-05814-YGR, 2012 WL 2503828, at *4 (internal citations omitted). Therefore, taking into consideration the current length of delay, the source of the delay, and the unknown extent to which the defendants participated in delaying the adjudications, this *TRAC* factor tips in favor of Defendants. Additional discovery may lead the Court to reach a different finding.

### b.  Timetable

Both parties agree that there is no congressional timetable. *See* ECF No. 10-1 at 37; ECF No. 19 at 10. Accordingly, this factor is neutral. *See Qureshi*, No. C-11-05814-YGR, 2012 WL 2503828, at *6 (concluding "the second factor does not weigh strongly in favor of either party" because of the lack of mandatory timetable); *see also Ahrary v. Curda*, No. 2:11-cv-02992-GEB-EFB, 2012 WL 1641411, at *4 (finding second factor irrelevant because "there is no congressional timetable for [the applicable inquiry]"); *Mugomoke*, No. 2:10-cv-02166-KJM-DAD, 2012 WL 113800, at *7 ("The second factor can be dispensed with readily, as there is no congressional timetable for I-485 adjudications.").

### c.  Human Health and Welfare & Interests Prejudiced

Courts often analyze the health and human welfare and interests prejudiced by the delay together. *See Johnson*, 65 F. Supp. 3d at 930–31 (citing *Islam II*, 32 F. Supp. 3d at 1073). Plaintiffs assert they are "greatly prejudiced by each day they remain separated from their family members, and having the added, perpetual injury of knowing their family members are in danger." ECF No. 10-1 at 25; *see, e.g.*, Pls.' Ex. 3 (Plaintiff stating he and his fiancée have not seen each other since August 2018, and their "lives have been put on hold, which has made [him] suffer from depression, anxiety, and insomnia.

---

anticipate adjudication of application after five-year delay or how those concerns would be undermined by expediting plaintiff's I-485 application).

. . . With every moment that passes, we are losing our ability to have children and start our family."); Pls.' Ex. 4 ("my entire life has been put on hold, which has made me suffer from anxiety, an eating disorder, Polycystic ovary syndrome (PCOS), a worsening skin condition, hair loss, and insomnia. . . . I don't remember the last time I had a full night's rest due to my constant worry for [my husband's] safety and for our future"); Pls.' Ex. 6 (fearing for safety of her sons, who are Iranian nationals living in Malaysia, which like Iran, also has "crackdown on [Hinduism] and sexual orientation"); Pls.' Ex. 8 (Petitioner Plaintiff working with U.S. military and granted asylum cannot return to Iran to see her father, who suffers from prostate cancer, heart disease, diabetes, and chronic back pain). *See also Doe v. Risch*, 398 F. Supp. 3d 647, 657–58 (N.D. Cal. 2019) (finding third and fifth *TRAC* factors tip in plaintiffs' favor where ongoing family separation and fear of persecution for son who converted to Christianity in Iran caused son to suffer extreme anxiety and depression). Plaintiffs have also cited the burdensome costs of traveling to visit each other. *See, e.g.*, Pls.' Exs. 3–4, 6–7, 10.

These examples of Plaintiffs' emotional, physical, and financial suffering, in addition to Iran's largest Internet blackout and recent political unrest resulting in Plaintiffs' inability to contact relatives in Iran, leads the Court to find that health and human welfare are at stake. *See, e.g.*, Pls.' Exs. 3–4, 6, 8, 10–11; Pls.' Reply Br. Exs. B–G. Plaintiffs' interests in being reunited with their families and pursuing at least a final determination on their application so as to end a stressful waiting period are compelling. *See Qureshi*, No. C-11-05814-YGR, 2012 WL 2503828, at *6 ("Defendants do not dispute that Plaintiff suffers emotionally and financial from being separated from his family and that the benefits of permanent residence and eventual are also delayed while his Application is delayed."); *Johnson*, 65 F. Supp. 3d at 930–31 (holding plaintiffs' interests in pursuing final determination on application to end stressful waiting period are compelling); *see also Singh*, 470 F. Supp. 2d at 1069 (a "delay [in processing immigration status applications] is less tolerable given that human health and welfare are at stake"). Defendants appear to concede these *TRAC* factors as they do not assert any argument for or against them. Thus, these factors strongly tilt in Plaintiffs' favor.

**d.** **Effect of Expediting Delayed Action on Agency Activities of a Higher or Competing Priority**

Courts consider the effect of expediting delayed action on agency activities of a higher or competing priority. *TRAC*, 750 F.2d at 80. Plaintiffs assert "the agency's competing priorities are a difficult metric to analyze because Defendants have abandoned all pretense of competing priorities, by prioritizing only a blanket preclusion of entry . . . ." ECF No. 10-1 at 38–39. The Court notes that waivers have recently been granted to certain Plaintiffs in the case. *See, e.g.*, ECF No. 36-1 at 3–4. Thus, at least since the time Plaintiffs filed their preliminary injunction motion, it does not appear that Defendants are prioritizing a blanket preclusion of entry. *See Najafi*, No. 4:19-cv-05782-KAW, 2019 WL 6612222, at *7.[14]

The *Darchini* court was persuaded by the defendants' argument that the "effect of expediting delayed action on agency activities of a higher or competing priority" counseled against an injunction because of the thousands of pending waiver applications and sensitive national security and public safety determinations to make. *See Darchini*, No. 8:19-cv-01417-JVS-DFM, 2019 WL 6841991, at *5; *see also Yavari*, No. 2:19-cv-2524-SVW-JC, 2019 WL 6720995, at *8 ("national security concerns constitute the stated purpose for the proclamation, and given that this purpose has been expressly approved by the Supreme Court, we must weigh this factor decisively in favor of Defendants.") (citing *Trump*, 138 S. Ct. at 2420). *But see Doe v. Risch*, 398 F. Supp. 3d at 658 (rejecting defendants' argument that "it would be unfair for [plaintiff's security check for derivative asylum petition] to be prioritized at the expense of others ahead of [him] in the queue," reasoning defendants "do not establish that there is a queue, however, let alone [plaintiff's] place therein," and noting absence of evidence of number of petitions

---

[14] At least one other court in this district rejected the Government's argument that its eleven-year delay was not unreasonable where the Government cited examples of other exemptions it granted to visa applicants. *See Ahrary v. Curda*, No. 2:11-cv-02992-GEB-EFB, 2012 WL 1641411, *1, *4 (E.D. Cal. May 9, 2012). The court reasoned that the Government provided no indication as to when the *plaintiff* might be granted an exemption, if at all. *See id.*

pending longer than plaintiff's). Here, Plaintiffs assert there is no queue. *See* ECF No. 10-1 at 38–39. At this preliminary stage, however, the record does not provide sufficient information to evaluate this assertion. Thus, under the present facts and law, and given Plaintiffs' burden on a preliminary injunction motion, this factor tilts in Defendants' favor.[15]

### e.  <u>Impropriety</u>

Plaintiffs indicate they have not alleged impropriety at this juncture. *See* ECF No. 10-1 at 39. Given the "court need not find any impropriety lurking behind agency lassitude in order to hold that agency action is 'unreasonably delayed,'" this factor is neutral. *See TRAC*, 750 F.2d at 80; *see also Doe v. Risch*, 398 F. Supp. 3d at 658–59.

Considering the *TRAC* factors together at this preliminary stage, the Court find that Plaintiffs have not established a likelihood of success that Defendants have unreasonably delayed their waiver adjudications. Additional discovery may result in a different conclusion at a later time.

### 3.  <u>APA Claim Under § 706(2)(A)&(D)</u>

PP 9645 states that "a consular officer, or the Commissioner, United States Customs and Border Protection (CBP), or the Commissioner's designee, as appropriate, may, in their discretion, grant waivers on a case-by-case basis to permit the entry of foreign nationals for whom entry is otherwise suspended or limited if such foreign nationals demonstrate that waivers would be appropriate . . . ." PP 9645 § 3(c). Plaintiffs contend that PP 9645 only permits consular officers to make waiver

---

[15] At a certain point, however, Defendants cannot expect to keep Plaintiffs in the dark about when their applications will be adjudicated. *See Qureshi*, No. C-11-05814-YGR, 2012 WL 2503828, at *5 ("the Court finds that Defendants' failure to provide any indication of when Plaintiff can anticipate adjudication of his Application beyond the current five years is not reasonable."); *see also* Pls.' Ex. 58 at 24 (June 27, 2019 State Department Q&As stating: "The granting of a waiver under the P.P. is a decision that is made by the consular officer and the manager as part of the adjudication. Because some applicants will need [redacted] to assist post in determining their eligibility under the national security criterion, *there may be some delay and we cannot estimate the time required for processing*.") (emphasis added).

determinations, and that requiring consular officers to seek concurrence from "the Visa Office and other opaque agencies and offices" constitutes an unlawful usurpation of consular officer authority under PP 9645. *See* ECF No. 10-1 at 14. Plaintiffs argue that Defendants' standards, policies, and procedures "designating the authority and discretion to approve case-by-case waivers to non-consular officers, including consular managers, visa chiefs, consular section chiefs, consular management, the Visa Office, and even independent contractors with the firm Quality Support, Inc." is arbitrary and capricious that violates § 706(2)(A) and (D) of the APA. *See* ECF No. 1 ¶¶ 1, 8, 10–12; ECF No. 10-1 at 34.

Defendants argue that PP 9645 does not define "consular officer," nor does it require that the role only includes rank-and-file officers, and does not prohibit oversight or assistance from experienced consular managers and supervisors. *See* ECF No. 19 at 13–14. Without a supporting declaration, Defendants contend the "consular officer is making Plaintiff visa applicants' waiver determination; the officer is merely consulting with supervisors and national-security experts in conducting the national-security vetting." *Id.* at 14. Defendants add that PP 9645 "envisions this larger agency support and involvement, in that it provides for the Secretary of State and the Secretary of Homeland Security to promulgate 'standards, policies, and procedures for: . . . determining whether the entry of a foreign national would not pose a threat to the national security or public safety of the United States." *Id.* (internal citation omitted).

At this preliminary stage, Plaintiffs have not met their burden in establishing a likelihood of success that PP 9645 does not allow for the concurrence of consular managers or visa chiefs in adjudicating waivers. While PP 9645 does not define "consular officer," the Immigration and Nationality Act provides that the term "'consular officer' means any consular, diplomatic, or other officer or employee of the United States designated under regulations prescribed under authority contained in this chapter, for the purpose of issuing immigrant or nonimmigrant visas . . . ." 8 U.S.C. §

1101(a)(9).[16]

There is also not enough information in the record at this point regarding the independent contractor Quality Support, Inc., or other "opaque agencies and offices," and their alleged role in the waiver adjudication process. Additional discovery may illuminate this issue, which may affect the Court's analysis as to whether Defendants are improperly designating the authority to grant case-by-case waivers to individuals or entities not envisioned by PP 9645.

### 4. Equal Protection and Procedural Due Process

Plaintiffs do not address their equal protection and procedural due process claims in their preliminary injunction filings. Therefore, the Court will not examine them.

## B. Irreparable Harm

Plaintiffs must demonstrate that irreparable injury is "likely" in the absence of an injunction. *See Winter*, 555 U.S. at 22. A "possibility" of irreparable harm is insufficient. *See id.* As discussed above in the *TRAC* analysis, Plaintiffs have shown irreparable harm is likely absent an injunction. Defendants dispute that Plaintiffs will suffer irreparable harm absent injunctive relief, arguing that "the geographical [family] separation has existed for a long period, predating the Proclamation, and [Plaintiffs] do not explain how it will imminently change for the worse such that extreme or very serious damage will occur in the period before the Court can rule on the merits of their claims." ECF No. 19 at 16. In other words, Defendants appear to argue that because Plaintiffs have already endured separation for a long time, any further delays do not show irreparable harm.

This argument is severely misguided. That Defendants have been forced to be geographically separated from their families for a long time does not make the family separation they are currently

---

[16] As the Supreme Court has previously held, PP 9645 was a lawful exercise of discretion granted by INA § 212(f), 8 U.S.C. § 1182. *See Trump v. Hawaii*, 138 S. Ct. at 2408.

enduring less significant, as Defendants suggest.[17] Plaintiffs have suffered emotionally, physically, and financially from being separated from their families, especially during a time of political unrest and Internet blackouts of an unprecedented magnitude. *See, e.g.*, Pls.' Exs. 3–4, 6, 8, 10–11; Pls.' Reply Br. Exs. B–G. As the Court has previously noted, it is unclear under the present record the circumstances of Plaintiff P.A.'s death on December 20, 2019. *See* ECF No. 33.

Next, Plaintiffs argue the "withholding and indefinite delay of [waiver adjudications] . . . obstructs Plaintiffs' ability to make appropriately informed life decisions like whether they should be pursuing third countries to legally reside and work, and escape the wrath of a U.S.-Iran military conflict, or to bring legal challenges to the Defendants' final decisions." ECF No. 10-1 at 31–32. Defendants argue that Plaintiffs do not explain how the Beneficiary Plaintiffs' immediate admission into the United States is the only way for Petitioner Plaintiffs to see their relatives. *See* ECF No. 19 at 16.[18] However, Plaintiffs have entered several declarations into the record noting the economic hardships of traveling to see Beneficiary Plaintiffs, or inability to travel to Iran because of their asylum status. *See, e.g.*, Pls.' Exs.

---

[17] Here, Defendants concede that all Plaintiffs have met the personal hardship prong. *See* ECF No. 19 at 4–5. Thus, following Defendants' Foreign Affairs Manual, Defendants have recognized an "unusual situation exists that compels immediate travel by the applicant and that delaying visa issuance and the associated travel plans until after visa restrictions imposed with respect to nationals of that country are lifted would defeat the purpose of travel." Pls.' Ex. 81 at 6 (9 FAM 302.14-10(D)).

[18] Defendants include a *Cf.* cite to *Gebhardt v. Nielsen*, 879 F.3d 980, 988 (9th Cir. 2018), for the proposition: "As we have said before, the generic right to live with family is 'far removed' from the specific right to reside in the United States with non-citizen family members." The court concluded, in the context where the plaintiff had been convicted of a sex offense against a child under fourteen, that the recognition of a "fundamental right to reside in the United States" with non-citizen relatives did not outweigh "Congress' plenary power over immigration" in a case involving an I-130 visa petition. *See Gebhardt*, 879 F.2d at 983, 988. *Gebhardt* is irrelevant to the question at hand, which asks whether Plaintiffs will suffer irreparable harm absent injunctive relief. In contrast, the issue in *Gebhardt* involved whether one had a protected liberty interest. Therefore, *Gebhardt* does not apply.

1–10.

Defendants additionally argue that "it is entirely speculative whether the Court's entry of the preliminary injunctive relief . . . would result in [Plaintiffs'] admission to the United States." ECF No. 19 at 16. Courts have both accepted and rejected these types of arguments. *See, e.g.*, *Qureshi*, No. C-11-05814-YGR, 2012 WL 2503828, at *6 (noting in case involving five-year-delay: "Plaintiff unquestionably recognizes the potential consequences of forcing the [Government] to decide his Application. Plaintiff is apparently ready and willing to take his chances with the appeals process if he is denied. Moreover, Defendants do not dispute that Plaintiff suffers emotionally and financially from being separated from his family and that the benefits of permanent residence and eventual citizenship are also delayed while his Application is delayed."); *Mugomoke*, No. 2:10-cv-02166-KJM-DAD, 2012 WL 113800, at *8 (noting in case involving seven-year delay: "The court presumes [plaintiff] himself knows the potential consequences should his application be denied. The fact that he wishes to have the application adjudicated now . . . supports an inference that the harm of delay is not remote or insignificant."). *But see Darchini*, No. 8:19-cv-01417-JVS-DFM, 2019 WL 6841991, at *6 (finding plaintiffs had not demonstrated likelihood of irreparable harm where plaintiffs admitted they had no guarantee waiver would be granted).

Lastly, Plaintiffs argue that the delay in adjudicating waiver determinations creates "a domino effect . . . [S]hort delays can cause criminal, medical, and security checks to expire and must therefore be reinitiated, creating an infinity loop of administrative processing, prolonging and exponentially multiplying the time that Plaintiffs live in uncertainty concerning the future and safety of their lives," in addition to incurring costs. *See* ECF No. 10-1 at 32 (citing Pls.' Ex. 65 at 6 ("some immigrant visa applicants are required by the [INA] or implementing regulations to submit certificates and other documentation that may have expired during the waiver process. For example, IV applicants are required to present valid police and medical certificates. If the information in these certificates has expired, the applicant may need time to renew them")). Defendants do not address this argument. *See*

*generally* ECF No. 19.

In considering the above arguments, the Court finds that this preliminary injunction factor weighs in Plaintiffs' favor.

**C.    Balance of Equities and Public Interest**

Plaintiffs seek an order requiring Defendants to adjudicate their waivers within fifteen days. *See* ECF No. 10-1 at 39. Plaintiffs contend without further explanation that an order requiring adjudication within fifteen days "minimizes the burden on the Defendants, while supporting the public interest." *Id.* Plaintiffs argue "the main counterweight to PP 9645's draconian preclusion of entry based on an applicant[']s country of origin is the waiver consideration, so it is in the public interest that waiver consideration is real." *Id.* While the Court acknowledges Plaintiffs' hardships, the Court is not convinced that requiring Defendants to adjudicate Plaintiffs' waivers within fifteen days would be a minimal burden given the national security and public safety concerns at issue. *See Najafi*, No. 4:19-cv-05782, 2019 WL 6612222, at *8; *Darchini*, No. 8:19-cv-01417, 2019 WL 6841991, at *6.

**D.    Sliding Scale Analysis of the Preliminary Injunction Factors**

While the Court sympathizes with Plaintiffs and finds that they will likely suffer irreparable harm absent injunctive relief, the law requires a plaintiff on a preliminary injunction motion to "demonstrate[] *either* a combination of probable success on the merits and the possibility of irreparable injury *or* that serious questions are raised and the balance of hardships tips sharply in his favor." *Cal. State Bd. of Accountancy*, 72 F.3d at 1429 (emphasis in original) (internal quotations and citation omitted). For the purposes of injunctive relief:

> "[S]erious questions" refers to questions which cannot be resolved one way or the other at the hearing on the injunction and as to which the court perceives a need to preserve the status quo lest one side prevent resolution of the questions or execution of any judgment by altering the status quo. [Citation omitted.] Serious questions are "substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation."

*Cal. v. Health & Human Servs.*, 351 F. Supp. 3d 1267, 1284 (N.D. Cal. 2019) (holding "serious

questions" existed regarding whether religious and moral exemptions to contraceptive mandate of Affordable Care Act were inconsistent with Women's Health Amendment of ACA, which sought to promote access to women's healthcare, in violation of APA) (quoting *Republic of the Philippines v. Marcos*, 862 F.2d 1355, 1362 (9th Cir. 1988), *cert. denied*, 490 U.S. 1035 (1989)); *see also Villajin v. Mukasey*, No. CV-08-0839-PHX-DGC, 2008 WL 2705144, *3–4 (D. Ariz. July 8, 2008) (holding "serious questions" existed regarding alien plaintiff's constitutional right to effective assistance of counsel where former counsel allegedly prevented plaintiff from filing timely appeal); *Smith v. Reiskin*, No. C-18-01239-JSW, 2018 WL 7820727, *3–4 (N.D. Cal. Oct. 10, 2018) (granting preliminary injunction and ordering return of plaintiff's car where "serious questions" existed regarding whether defendants could justify seizure and retention of vehicle if plaintiff could not afford parking tickets and seizure was reasonable to secure repayment of debt). *But see Beloozerova v. Dignity Health*, No. CV-18-01976-PHX-DGC, 2018 WL 3660043, *6 (D. Ariz. Aug. 2, 2018) (holding plaintiff failed to raise "serious questions" regarding breach of contract claim where she could not likely establish $450,000 grant money would satisfy her external funding requirements for research position). "Serious questions" do not need to "promise a certainty of success, nor even present a probability of success, but must involve a fair chance of success on the merits." *Marcos*, 862 F.2d at 1362.

Plaintiffs have undeniably raised difficult questions, but the issue is whether they have raised "serious questions." *See Marcos*, 862 F.2d at 1362. Under the current law and facts at this early stage, the Court does not find Plaintiffs have demonstrated a fair chance of success on the merits for unreasonable delay and their APA § 702(6) claim that would allow the strong showing of irreparable harm to offset the lack of the first requirement. *See id.*; *Najafi*, No. 4:19-cv-05782-KAW, 2019 WL 6612222, at *8. Even if Plaintiffs had met this "serious questions" standard, granting Plaintiffs their requested relief—requiring Defendants to adjudicate their waivers within fifteen days—would go beyond preserving the status quo. *See Marlyn Neutraceuticals, Inc.*, 571 F.3d at 879 ("[a] mandatory injunction goes well beyond simply maintaining the status quo [p]endente lite [and] is particularly

disfavored.").

The Court reminds the parties that this is only a preliminary stage in the proceedings. This is not a ruling on the merits. At this juncture, Plaintiffs had the burden based on the limited discovery allowed. Additional discovery and changed circumstances may impact the Court's analysis. Unlike as Defendants contend, the Government has a legal obligation to adjudicate Plaintiffs' waiver adjudications, and it cannot unreasonably delay doing so.

## V. <u>CONCLUSION</u>

For the reasons stated above, the Court:

1. **DENIES** the preliminary injunction motion.

2. The Court believes this order does not contain any information that should remain under seal and therefore intends to release an unsealed version. However, in an abundance of caution, the parties are **ORDERED TO SHOW CAUSE** within five (5) days of the date of this order why any part of this order should be redacted.

3. The Clerk of Court is directed to serve counsel of record.

IT IS SO ORDERED.

Dated:    **January 7, 2020**            **/s/ Lawrence J. O'Neill**
                              UNITED STATES DISTRICT JUDGE